NATIONAL ORGANIZATION FOR WOMEN et al.; Petitioners, *v.* STATE DIVISION OF HUMAN RIGHTS, and GANNETT COMPANY, INCORPORATED, Respondent.

Fourth Department, November 30, 1972.

*Donald Elliot Grossfield* for National Organization for Women, petitioner.

*Nixon, Hargrave, Devans & Doyle* (*Eugene D. Ulterino* and *Truman Searle* of counsel), for respondent.

*Henry Spitz, General Counsel for Division of Human Rights.*

*A. Bernard Frechtman, amicus curiae.*

MARSH, J. The National Organization For Women (NOW) and the Association of Personnel Agencies of New York, Inc. (APANY) have petitioned this court, pursuant to section 298 of the Executive Law, for review of an order of the State Human Rights Appeal Board, dated June 7, 1972, affirming in all respects a determination and order of the State Division of Human Rights, dated June 2, 1971, dismissing a verified complaint filed by NOW against the respondent, the Gannett Company, Incorporated (Gannett).

The respondent, Gannett, publishes two newspapers in the Rochester-Monroe County area, the *Democrat & Chronicle* and the *Times Union*. Both papers contain classified employment advertising in columns which have the following designations:

Employment Agencies
Help Wanted — Female
Help Wanted — Male
Situations Wanted — Female
Situations Wanted — Male
Help Wanted — Male-Female

The following notice appears at the beginning of the classified advertising section:

"IMPORTANT NOTICE

"Employment

"The New York State Law on Human Rights and the Federal Civil Rights Act of 1964 prohibit discrimination in employment because of age and sex unless based on a bona fide occupational qualification. Help Wanted and Situations Wanted advertisements are arranged in columns captioned 'Male' and 'Female' for the convenience of readers and are not intended as an unlawful limitation or discrimination based on sex."

The above notice is printed in accordance with the New York State Division of Human Rights' policy which states that help wanted and situations wanted advertisements may be classified into male and female columns provided that the above notice clearly accompanies such classification. Placement of an advertisement in a particular column is dictated solely by the advertiser. If an advertiser does not have a specific column in mind, Gannett will point out the columns which are available but it does not suggest where the advertisement should be placed.

On May 3, 1971, NOW filed a verified complaint with the State Division of Human Rights charging that Gannett was engaging in an unlawful discrminatory practice by publishing classified advertisements under the column headings "Help-Wanted-Male" and "Help-Wanted-Female". After an investigation, the Regional Director of the State Division of Human Rights dismissed the complaint on the ground that there was no probable cause to believe that Gannett was engaging in an unlawful discriminatory practice. The Regional Director noted that, inasmuch as the complaint was not based upon the language of any particular advertisement but upon the practice of classifying advertisements, the complaint had to be dismissed, since Gannett's practice was in accordance with Division policy.

NOW appealed this determination to the State Human Rights Appeal Board and APANY was granted permission to appear *amicus curiae* by Hon. J. Edward Conway, Chairman, State Human Rights Appeal Board. On June 7, 1972, the State Human Rights Appeal Board affirmed the determination and order of the Regional Director. The board noted that since the complaint failed to allege that any individual was seeking employment or was dissuaded from seeking employment or that any individual employer had in fact discriminated, it was constrained to hold that the complaint against Gannett was properly dismissed.

Subdivision 4 of section 292 of the Executive Law provides: " The term ' unlawful discriminatory practice ' includes only those practices specified in section two hundred and ninety-six of this article."

Section 296 of the Executive Law declares that: " 1. It shall be an unlawful discriminatory practice: * * * (d) For any employer or employment agency to print or circulate or cause to be printed or circulated any statement, advertisement or publication, or to use any form of application for employment or to make any inquiry in connection with prospective employment, which expresses directly or indirectly, any limitation, specification or discrimination as to age, race, creed, color or national origin or *sex*, or any intent to make any such limitation, specification or discrimination, unless based upon a bona fide occupational qualification. * * * 6. It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." (Italics supplied.)

Section 297 of the Executive Law provides: " Any person claiming to be aggrieved by an unlawful discriminatory practice may, by himself or his attorney-at-law, make, sign and file with the division a verified complaint in writing which shall state the name and address of the person alleged to have committed the unlawful discriminatory practice complained of and which shall set forth the particulars thereof and contain such other information as may be required by the division."

Title VII of the Civil Rights Act of 1964 declares that: " It shall be an unlawful employment practice for an employer, labor organization, or employment agency to print or publish or cause to be printed or published any notice or advertisement relating to employment by such an employer or membership in or any classification or referral for employment by such a labor organization, or relating to any classification or referral for employment by such an employment agency, indicating any preference,

limitation, specification, or discrimination, based on race, color, religion, sex, or national origin except that such a notice or advertisement may indicate a preference, limitation, specification, or discrimination based on religion, sex, or national origin when religion, sex, or national origin is a bona fide occupational qualification for employment." (U. S. Code, tit. 42, § 2000e–3, subd. [b]).

The New York Division of Human Rights has formulated the following ruling regarding pre-employment specifications and advertisements:

"The general test as to whether an advertisement placed in a newspaper is lawful or unlawful is whether the advertisement specifies a barrier excluding applicants of one sex and limiting the job opportunity to applicants of the other sex.

"Help Wanted and Situation Wanted advertisements may be classified into Male and Female columns provided, however, that the following legend clearly accompanies said classification:

"Important Notice: The New York State Law Against Discrimination and the Federal Civil Rights Act of 1964 prohibit discrimination in employment because of sex unless based on a bona fide occupational qualification. Help Wanted and Situation Wanted advertisements are arranged in columns captioned 'Male' and 'Female' for the convenience of readers and are not intended as an unlawful limitation or discrimination based on sex." (2 Employment Practices Guide [C. C. H., Loose Leaf], par. 26,053 C, p. 8905.)

The Equal Employment Opportunity Commission has established the following guideline on sex discrimination in job opportunities advertising: "It is a violation of Title VII [of the Civil Rights Act of 1964] for a help-wanted advertisement to indicate a preference, limitation, specification, or discrimination based on sex unless sex is a bona fide occupational qualification for the particular job involved. The placement of an advertisement in columns classified by publishers on the basis of sex, such as columns headed 'Male' or 'Female', will be considered an expression of a preference, limitation, specification, or discrimination based on sex." (Code of Fed. Reg., tit. 29, § 1604.4, adopted Aug. 14, 1968.)

It is the respondent's contention that NOW is not "an aggrieved person" within the meaning of section 297 of the Executive Law. Several cases in this State have dealt directly with the question of what is required to attain the status of "an aggrieved person" under section 297 of the Executive Law and we agree with their holding that an organization whose

members are injured by an alleged discriminatory act has a right to maintain a proceeding seeking judicial review.

In *Matter of American Jewish Congress* v. *Carter* (19 Misc 2d 205, affd. 9 N Y 2d 223), it was held that the American Jewish Congress had an interest in maintaining a proceeding involving alleged unlawful discriminatory practices against Jews. In this case, the State Commission Against Discrimination (the predecessor agency to the State Division of Human Rights) had granted a bona fide occupational qualification to the Arabian American Oil Company permitting it to make inquiries as to the religion of applicants whose employment required an entry visa to Saudi Arabia which denied visas to Jews. The American Jewish Congress filed a complaint with the State Commission seeking to have the bona fide occupational qualification nullified. In denying the Arabian American Oil Company's motion to dismiss the proceeding, the court noted that the "Petitioner here has a vital interest, shared with the People of the United States. It is to protect citizens of the United States and particularly of the State of New York, from the destruction of their basic rights at the instance of a foreign government" (19 Misc 2d 205, 206).

In *Matter of Glen Cove Civ. Serv. Comm.* v. *Glen Cove N. A. A. C. P.* (34 A D 2d 956) the Glen Cove Chapter of the N. A. A. C. P. filed a complaint with the State Division of Human Rights alleging that Negroes were systematically banned from the position of fire alarm dispatcher. In affirming the State Division of Human Rights finding that the Glen Cove Civil Service Commission had committed an unlawful discriminatory act, the Second Department noted (p. 957) that the "respondent N. A. A. C. P. was entitled to lodge the complaint as an aggrieved party under the pertinent provisions of the Human Rights Law (see * * * § 297)."

The only other case coming to our attention dealing with the question of what is required to be "an aggrieved person" under section 297 of the Executive Law is *Matter of Cumberbatch* v. *Lytle* (55 Misc 2d 1041). In this case, Supreme Court, Erie County, confirmed a determination by the State Commission for Human Rights that a "tester" for a civil rights organization was not an aggrieved person entitled to file a complaint under section 297. This case can be distinguished from *Matter of American Jewish Congress* and *Matter of Glen Cove Civil Service Commission* because the complaint was filed "by the petitioner as an individual and was not made on behalf of any civil rights organization". (*supra,* p. 1042.) That is to say, peti-

tioner in that case was not alleging any discriminatory practice against himself individually nor was he alleging any discriminatory act on behalf of a civil rights organization.

In support of its argument that petitioner is not an aggrieved party, respondent relies heavily on a case recently decided in the United States Supreme Court, *Sierra Club .v. Morton* (405 U. S. 727). Respondent's reliance on the *Sierra Club* case is misplaced. At the outset of his majority opinion denying the *Sierra Club* standing to enjoin Federal officials from approving an extensive development in Mineral King Valley, Mr. Justice STEWART observed that the question presented in that case was "what must be alleged by persons who claim injury of a noneconomic nature to interests that are widely shared." (*supra*, p. 734). The issue in the instant case is immediately distinguishable from the issue in *Sierra Club*, since it involves an alleged economic injury of considerable magnitude, whereas the widely shared interests involved in *Sierra Club* were of an aesthetic, conservational, and recreational nature.

The principal issue before this court is whether there has been a legislative declaration that a newspaper commits an unlawful discriminatory act if it prints or publishes any advertisement which indicates a preference as to sex.

It is clear that section 296 (subd. 1, par. [d]) of the Executive Law, quoted above, applies only to employers and employment agencies. In defining the latter designation, subdivision 2 of section 292 of the Executive Law provides: " The term ' employment agency ' includes any person undertaking to procure employees or opportunities to work." Two cases have considered the question of whether a newspaper qualifies as an employment agency as that term is used in anti-discrimination legislation. In *NOW* v. *Buffalo Courier Express* (71 Misc 2d 917, 918), Mr. Justice MAHONEY held that the " absence of specific reference to the publication and newspaper industry in said statute [Executive Law, § 296, subd. 1, par. (d)] must mean that the Legislature did not intend to place said enterprises in the same category as an employment agency." In *Brush* v. *San Francisco Newspaper Print. Co.* (315 F. Supp. 577, 580), the District Court was called upon to construe the Federal counterpart to section 296 (subd. 1, par. [d]), section 2000e–3 (subd. [b]) of title 42 of the United States Code and it ruled that the term " employment agency " does not include newspapers. In the course of its opinion, after observing that a regular employment agency and an employer were in a position to determine whether or not sex is a

bona fide occupational qualification for employment, the court stated (pp. 581–582):

" But, such information is not ordinarily within the knowledge of the newspaper to which the employer or the employment agency presents the advertising copy — ordinarily over a desk or by mail. Nor does the pertinent background information necessarily appear on the face of the advertising copy presented to the newspaper."

" If plaintiffs are correct in their contention that the term advertising agency includes newspapers, the latter must henceforth make the necessary personnel and procedural arrangements to control, supervise, screen and otherwise investigate each advertisement published by them in order to meet the newspaper's responsibility under the statute — the very matters which, according to the legislative history of Section 2000e–3 (b), were *not* intended by the Congress.

" The House Judiciary Committee Report on the Civil Rights Act of 1964, 2 U. S. Code Cong. & Adm. News (1964) p. 2403, commenting on this Section 2000e–3 (b), states: ' The prohibitions of this section do not require newspapers and other publications to exercise any control or supervision over, or to do any screening of the advertisements or notices published by them.'

" This indicates quite clearly, we believe, that the Congress had no intention of imposing upon newspapers the obligations imposed upon employers and ordinary ' employment agencies.'

" Also, at 110 Cong. Rec. 7213, April 4, 1964, appears an ' Interpretative Memorandum ' prepared by Senators Clark and Case, Senate floor managers of the Civil Rights Act. Referring to this Section 2000e–3 (b) the memorandum states that the section ' prohibits discriminatory advertising by employers, employment agencies and labor organizations   *   *   *.   It should be noted that the prohibition does not extend to the newspaper or other publications printing the advertisement. In runs solely to the sponsoring firm or organization.'

" Fully aware of the caution with which legislative history may be considered as indicating an exception to the provisions of public interest legislation (NLRB v. Fruit and Vegetable Packers etc., Local 760, 377 U. S. 58, 84 S. Ct. 1063, 12 L. Ed. 2d 129 (1963); United States v. Oregon, 366 U. S. 643, 81 S. Ct. 1278, 6 L. Ed. 2d 575 (1961)), we are convinced that the legislative history in the pending case shows that the term ' employment agency ' was used in its ordinary sense rather than in such a broad sense as would include newspapers."

We likewise hold that if the Legislature intended to include newspapers within the ambit of section 296 (subd. 1, par. [d]), it could have said that it is an unlawful discriminatory act for any person, newspaper, employer or employment agency to print or publish an advertisement which expresses a preference as to sex. Since it did not, the Legislature must have intended to exclude newspapers from the purview of that section.

Petitioners further contend that the E. E. O. C. "has outlawed sex segregated advertising columns", and cite the E. E. O. C. regulation contained in section 1604.4 of title 29 of the Code of Federal Regulations in support of their contention. A careful reading of this ruling reveals that it prohibits only employers and employment agencies from placing an advertisement in columns classified by publishers under the headings "Male" and "Female" unless sex is a bona fide occupational qualification. To construe it as prohibiting newspapers from publishing such column headings would be to accord to the E. E. O. C. authority, not conferred upon it by statute, to impose its regulations upon newspapers (see *American Newspaper Publishers Assn.* v. *Alexander,* 294 F. Supp. 1100).

Finally, petitioners assert that the respondent Gannett is guilty of aiding and abetting an unlawful discriminatory act in violation of section 296.6 of the Executive Law by publishing sex designated help wanted advertisements. In support of their contention they cite *Pittsburgh Press Co.* v. *Pittsburgh Comm. on Human Relations* (3 Employment Practices Decisions [C. C. H.], par. 8154 [Ct. of Common Pleas, Allegheny County, Pa.], affd. 4 E. P. D. par. 7732 [Commonwealth Ct. of Pa.]) which involved human rights ordinances of the City of Pittsburgh. The city ordinance involved was an explicit and exact statutory scheme that solved the dilemna presented by the comparable Federal and New York legislation. The pertinent provisions of the city ordinance read as follows: "It shall be an unlawful employment practice * * * except where based upon a bona fide occupational exemption certified by the Commission in accordance with Section 7, Subsection (d) of this Ordinance * * * (j) For any person, whether or not an employer, employment agency or labor organization, to aid, incite, compel, coerce or participate in the doing of any act declared to be an unlawful employment practice by this ordinance".

Subsection (d) of section 7, mentioned in the above quotation, reads: "The Commission shall have the power and it shall be its duty to: * * * (d) Certify upon the request of any per-

son that a particular occupation or position is exempt from the provisions of this ordinance relating to unlawful employment practices if the Commission finds that the occupation or position reasonably requires the employment of a person or persons of a particular  *  *  *  sex and that such certification is not sought as means of circumventing the spirit and purpose of this ordinance, the burden of proving the facts required for such a finding to be in each instance upon the person requesting the certification of exemption from the provisions of this ordinance." (4 E. P. D. par. 7732, pp. 5830, 5831.)

The *Pittsburgh Press* published classified help wanted advertisements in columns headed " Male " and " Female ". In holding that the *Pittsburgh Press* was guilty of aiding employers to discriminate on the basis of sex, the Commonwealth Court of Pennsylvania noted that: " This is not a matter of whether the Pittsburgh Press intentionally conspired with some employer or employers to discriminate against women. What is of importance is that through the use of its arbitrarily selected column headings the Pittsburgh Press ' aids ' such employers to discriminate. When the Pittsburgh Press arbitrarily arranges and publishes such column headings it is aiding in sex discrimination." (4 E. P. D. par. 7732, p. 5835).

It is clear that the *Pittsburgh* case is not affected by the rationale of *Brush* v. *San Francisco Newspaper Print. Co.* (315 F. Supp. 577, *supra*), which we adopt because the city ordinance specifically provided for a procedure whereby the press could determine whether or not a bona fide sex occupational qualification existed for a particular job. The city ordinance having imposed upon the local commission the duty to certify upon request by any person that a certain occupation was entitled to bona fide occupational qualification status, a newspaper only had to inquire as to whether or not the employer had a certificate of exemption from the local commission in order to determine the existence of a legitimate bona fide occupational qualification.

There being no provision under the law applicable to this proceeding whereby a newspaper can make a determination as to whether a factual basis exists for finding the absence of a bona fide occupational qualification, the *Pittsburgh* case has no application to the resolution of the issues here presented. To hold that the respondent Gannett aided and abetted an unlawful discriminatory act in violation of subdivision 6 of section 296 of the Executive Law requires that it be established that there was a knowledgeable and intentional participation on its part in the unlawful conduct charged. The maintenance of separate columns

of help wanted advertisements designated by sex does not, standing alone, establish such participation.

The determination should be confirmed.

DEL VECCHIO, J. P., MOULE and HENRY, JJ., concur.

Determination unanimously confirmed without costs.